IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 27, 2016

**BRANDON SUTTON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Jefferson County**
**No. 12236    O. Duane Slone, Judge**

---

**No. E2015-01729-CCA-R3-PC – Filed May 25, 2016**

---

The petitioner, Brandon Sutton, appeals the denial of post-conviction relief from his 2010 Jefferson County Criminal Court jury conviction of first degree murder, for which he received a sentence of life without parole. In this appeal, the petitioner contends only that he was denied the effective assistance of counsel. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Eve Charlesworth, Jefferson City, Tennessee, for the appellant, Brandon Sutton.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; James B. Dunn, District Attorney General; and Jeremy Ball, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A Jefferson County Criminal Court jury convicted the petitioner of first degree murder and imposed a sentence of life without the possibility of parole. This court affirmed the judgments on direct appeal. *See State v. Brandon Sean Sutton*, No. E2011-00398-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., Knoxville, Aug. 30, 2012), *perm. app. denied* (Tenn. Jan. 22, 2013).

In *Brandon Sean Sutton*, this court stated the facts of the case. The evidence showed that, on the evening of January 27, 2007, the petitioner, along with his sometime-girlfriend, Lisa Stout; the victim, Anthony Scott Gibbs; and several others, traveled together to a local nightclub, where the members of the group consumed alcohol. *Id.*, slip op. at 2, 4, 8. According to Ted Daniel Pollard, a friend of the petitioner's, the

other members of the group had been "drinking, smoking marijuana, and taking pills before they" arrived at the nightclub. *Id.*, slip op. at 8. The group stayed at the nightclub until it closed in the early morning hours of January 28, eventually returning to Ms. Stout's residence on North White Pine Road. *Id.*, slip op. at 2, 4-5. Ms. Stout was intoxicated and required assistance to enter the house; shortly after arriving, she began vomiting, and the petitioner followed her into the bathroom to care for her. *Id.*, slip op. at 5. According to the victim's best friend, Robert Harrison, the victim "went straight to [Ms. Stout's] couch and fell asleep" with "his head on a cushion and one foot hanging off the side of the couch." *Id.*

Christi Cate assisted Ms. Stout in changing her underwear because Ms. Stout "had urinated on herself." *Id.*, slip op. at 6. Ms. Cate did not recall where she left the soiled underwear but stated that "they might have fallen on the floor next to the couch." *Id.* After assisting Ms. Stout, Ms. Cate and the petitioner helped Ms. Stout into bed. *Id.* Ms. Cate drove Mr. Pollard to his home, and then she returned to Ms. Stout's residence. *Id.*, slip op. at 6, 7. When Ms. Cate and Mr. Harrison left the residence at approximately 4:00 a.m., Ms. Stout and the petitioner were in the bedroom, and the victim was "passed out" on the couch. *Id.*, slip op. at 5, 6. Before leaving, the petitioner asked Ms. Cate "to bring him a knife" because he "was afraid someone was going to 'come in on him or something.'" *Id.*, slip op. at 6. Ms. Cate brought the petitioner the only knife she could locate, a "fish fillet knife that had jagged edges and no handle." *Id.*

Mr. Harrison admitted that he had danced with Ms. Stout at the nightclub, but he denied engaging in sexual intercourse with her. *Id.*, slip op. at 4, 5. Mr. Pollard recalled that the petitioner had been "a little upset with Ms. Stout for dancing with Mr. Harrison" at the nightclub and that, later in the evening, the petitioner "was angry about having to take care of" Ms. Stout when she was intoxicated. *Id.*, slip op. at 7. Mr. Harrison, Ms. Cate, and Mr. Pollard all testified that the victim made no advances toward Ms. Stout, and Ms. Cate never witnessed the victim threaten or provoke the petitioner. *Id.*, slip op. at 4, 7.

Ms. Stout testified that, after consuming an entire pitcher of beer at the nightclub following a dare, she finished another glass of alcohol and noticed "a 'purplish' pill at the bottom of her glass," which she showed to the petitioner. *Id.*, slip op. at 8. Shortly thereafter, Ms. Stout became ill, and she testified at trial that "she had never been that drunk before." *Id.* Ms. Stout recalled that, after returning to her residence, she had urinated on herself while vomiting and that Ms. Cate had assisted her in changing her underwear. *Id.* Ms. Stout heard the petitioner and Mr. Harrison engaged in a heated exchange over leaving the outside door open, an exchange confirmed by Mr. Harrison, Ms. Cate, and Mr. Pollard. *Id.*, slip op. at 5, 6, 7, 9.

Ms. Stout remembered hearing something that sounded like kindling breaking after Ms. Cate and Mr. Harrison had left. Ms. Stout stated an axe was hanging on a wooden plaque on her bedroom wall. She said that sound could have been the axe coming off the wall. She also remembered telling Tennessee Bureau of Investigation ("TBI") Agent Brian Fraley that she heard several loud thumps. Ms. Stout said she heard [the petitioner] saying, "you want to play motherf[], we'll play[.]" Ms. Stout was still in her bedroom, and [the petitioner] was in the living room. Ms. Stout did not hear the victim say anything. [The petitioner] came into the bedroom, held a knife to Ms. Stout's throat, and asked her if she wanted to die with him because "he had done messed up." Ms. Stout told [the petitioner] that he was not going to do anything. [The petitioner] told her that he already "done it" and to "get up." [The petitioner] told Ms. Stout that he killed the victim.

Ms. Stout put on her pants, went in the living room, and ran for the phone. Ms. Stout saw the victim lying on the couch "dying." She said he had head injuries that were bleeding very badly. Ms. Stout called 911. She idenitifed the 911 recording, and the prosecution played it for the court.

. . . .

Ms. Stout testified the victim did not make any advances toward her nor did he speak angrily to her that evening. She said the victim did not have any cross words with [the petitioner], and she did not know why [the petitioner] would have been mad at the victim.

*Id.*, slip op. at 9. Ms. Stout testified that she had "taken at least ten Valium and Xanax the night of the incident," in addition to using cocaine, and that the petitioner had taken "a Xanax pill and smoked marijuana," but that he had only consumed one beer. *Id.*, slip op. at 10. Ms. Stout denied cheating on the petitioner with the victim. *Id.* She identified the pair of underwear found in the living room floor as her own and claimed that she "did not know how the panties got in the living room and that only Ms. Cate or [the petitioner] would know." *Id.* Sperm found on Ms. Stout's underwear was analyzed by the Tennessee Bureau of Instigation ("TBI") and did not match the petitioner's or the

victim's deoxyribonucleic acid ("DNA") profile. *Id.* Ms. Stout testified that the sperm was from a third party, Sherman Biggs. *Id.*

When officers with the Jefferson County Sheriff's Department ("JCSD") and paramedics arrived at Ms. Stout's residence in the early morning hours of January 28, the victim was found lying on the sofa "with his whole head and face covered with blood" with "'real bad gash cuts' in the victim's head." *Id.*, slip op. at 2. JCSD Officer Joseph Owens testified that "[b]lood was on the couch, ceiling, and wall" with "[f]lesh . . . on the wall," and a responding paramedic described the scene as "especially 'gory'" with blood covering the victim as if he "had been there for quite awhile." *Id.*, slip op. at 2, 3. Officer Owens noticed that the victim's "jeans were pulled down to his thighs" and that the victim's "underwear was down on his thighs, but they still covered the victim's genitals." *Id.*, slip op. at 2. The two responding paramedics recalled that the victim's pants were pulled down as well. *Id.*, slip op. at 3.

TBI Agent Brian Fraley took a statement from the petitioner after advising the petitioner of his *Miranda* rights and the petitioner's waiver of the same. *Id.*, slip op. at 11.

In his statement, [the petitioner] said that the group picked him up at his mother's house and they went to the Midnight Rodeo. On the way there, [the petitioner] drank two or three beers. While at the Midnight Rodeo, [the petitioner] drank two or three more beers and took a Xanax tablet. The group stayed at the Midnight Rodeo until it closed. They drove to Mr. Harrison's trailer, and [the petitioner] stayed inside the vehicle while Mr. Harrison went inside for approximately twenty minutes. When Mr. Harrison returned, the group went to Ms. Stout's house. [The petitioner] accompanied Ms. Stout into her bathroom and helped her while she vomited. Ms. Stout eventually went into her bedroom, and [the petitioner] helped her get into the bed.

[The petitioner] stated that he went into the kitchen and that the victim was in the living room sitting on the couch. Everyone else was gone. [The petitioner] said he heard the victim mumbling. [The petitioner] asked the victim if he was talking to him and the victim replied, "f[] you or something like that." [The petitioner] went into the living room and said "f[] you." The victim said "f[] you," stood up, and told [the petitioner] that he would kill him. [The

- 4 -

petitioner] stated the victim pulled a knife out of his pocket. [The petitioner] saw an axe on the table, grabbed it, and hit the victim in the head with it. The victim fell down on the couch, and [the petitioner] hit him "a couple more times while he was on the couch laying down."

[The petitioner] said that he looked down, saw the knife on the floor, and picked it up with his left hand while holding the axe with his right hand. Ms. Stout came in the living [room] and said "Oh, my God. Oh, my God." Ms. Stout went to the kitchen and called 911. [The petitioner] said that Ms. Stout told him to leave before her father arrived. [The petitioner] ran away with the axe handle and knife still in his hands. He ran into the woods and threw away the axe and knife. He stayed in the woods for a while before going to a trailer behind Ms. Stout's house and falling asleep. When he awakened, he saw that no one was inside Ms. Stout's house, and he went inside. [The petitioner] called his mother, who told him that Deputy David Crowder was at her house. [The petitioner] talked to Deputy Crowder, who asked [the petitioner] to turn himself in. [The petitioner] told Deputy Crowder that he was going to get a ride to the sheriff's department. Instead, [the petitioner] obtained a ride to his brother's house. The girlfriend of [the petitioner's] brother called [the petitioner's] mother and told her that [the petitioner] was there. Deputy Crowder and other officers arrived, arrested [the petitioner], and transported him to the [JCSD].

In addition to his statement, [the petitioner] told Agent Fraley that he sat in the woods behind Ms. Stout's home all day and watched authorities process the crime scene. Agent Fraley testified that he and Sergeant Coleman searched the woods behind Ms. Stout's house for the axe handle and the knife that [the petitioner] said he threw. Agent Fraley identified a photograph of the axe handle that they found. He also identified a photograph of the place on the wall where the axes had been hanging in Ms. Stout's room.

*Id.*, slip op. at 11-12.

JCSD Chief Detective Ronnie Coleman testified that, when he arrived at the crime scene on January 28, the living room "'was pretty much just a blood scene with [blood] all over the wall, the ceiling, the couch, [and] the floor.'" *Id.*, slip op. at 13-14. Through the testimony of Detective Coleman, the State introduced into evidence photographs and a video recording of the crime scene. *Id.*, slip op. at 14. Lab test results revealed the presence of the victim's blood on the petitioner's pants. *Id.* JCSD Deputy Robert Morgan spoke with the petitioner on January 30, and the petitioner told him "that 'they should give him the death penalty because he took another man's life[.]'" *Id.*

Forensics consultant Paulette Sutton, who specialized in blood stain pattern analysis, testified that the blood spatter from the scene "was consistent with an injury inflicted by an axe" and that the blood patterns at the scene made it appear "that the victim was lying on the couch with his head on the pillow" at the time of the attack. *Id.*, slip op. at 15.

Doctor Darinka Mileusnic-Polchan, chief medical examiner for Knox and Anderson Counties, testified that "the victim's cause of death was multiple sharp and blunt force trauma." *Id.*

> Dr. Mileusnic-Polchan testified that the sharp force trauma to the victim consisted of two main "chopping" injuries on the back of his head. One injury was "about 4.2 inches long, letter C-shape, and essentially shaved the scalp all the way to the bone." This injury was a very deep injury that undermined the scalp, but it did not penetrate the bone. The other major sharp force injury was right above the first injury. Dr. Mileusnic-Polchan explained that "[i]t was almost kind of crescent shaped. That was the devastating injury that went through the skull all the way through bone fragment and bone extensively and then cut[] through the coverings of the brain and went into the brain." She said that this injury was 5.7 inches long and essentially severed the front and back parts of the left hemisphere into two halves.

> Dr. Mileusnic-Polchan identified a photograph of the injuries to the back of the victim's head and explained them to the jury. The photograph showed sharp force injuries and blunt force trauma. Dr. Mileusnic-Polchan stated that she initially thought that different instruments caused the sharp and blunt force trauma. She further stated that it was the same weapon in a different condition because the blade had

detached. She reviewed a photograph of the axe and said that it was consistent with a weapon that could cause sharp force trauma.

. . . .

Dr. Mileusnic-Polchan stated the victim sustained at least twelve blows to his head. Two of the blows were "clear-cut chopping" injuries. Dr. Mileusnic-Polchan testified that "the first blows [were] the chopping injuries because that's the only time when we have the blades positioned at the end of a handle . . . . From that point on, obviously, the handle [was] falling off and that's why everything that follows is in the blunt trauma." Dr. Mileusnic-Polchan marked a model head with the location of the blows.

Based on the crime scene photographs, Dr. Mileusnic-Polchan testified that the victim was on the couch with his head hanging off the couch when he received the injuries. She stated that the injuries were not "immediately deadly" and would not necessarily have caused the victim to lose consciousness. She further stated that the victim would have had pain and disorientation but would not have been immediately disabled. Dr. Mileusnic-Polchan said it was possible that the victim could have been turning and his head was not on the couch. According to Dr. Mileusnic-Polchan, the injuries sustained by the victim were beyond those necessary to cause death, and the injury to the brain alone would have eventually caused death.

In preparation for her testimony, Dr. Mileusnic-Polchan reviewed [the petitioner's] statement that explained his version of the events. She stated [the petitioner's] assertion of self-defense was inconsistent with the victim's injuries. She further stated that inflicting the injuries on the back of the victim's head in a standing position would have been extremely difficult if the men were facing each other. Dr. Mileusnic-Polchan said that there would not have been room for an axe that was at least two feet long to strike the victim, who was 5'9" in height, because when he stood the ceiling would have been only one foot above the victim's

head. However, she said that inflicting the injuries would have been possible if the victim were lying on the couch.

*Id.*, slip op. at 15-17.

On September 10, 2013, the petitioner filed, pro se, a timely petition for post-conviction relief, alleging, *inter alia*, that he was deprived of the effective assistance of counsel. Following the appointment of counsel and the amendment of the petition, the post-conviction court conducted an evidentiary hearing on August 11, 2015.

At the evidentiary hearing, trial counsel testified that she had been the second attorney appointed to represent the petitioner due to a conflict of interest that developed with the petitioner's first appointed attorney. Trial counsel stated that, although the petitioner had claimed he had acted in self-defense, the "physical proof and everything [–] in the case did not [–] fit that" theory. After reviewing the photographs and discovery materials, it "was apparent" to trial counsel that the crime "was either voluntary [manslaughter] or it was first degree premeditated" murder. Upon reaching this conclusion, trial counsel and the petitioner discussed pursuing a defense of "a crime of passion":

> And it was going to be an issue in the end of premeditation and we discussed that and discussed the events that had led up to that night and how Ms. Stout had been acting and so [–] how long they had been together. She had had a history of doing things inappropriate to make him upset. So we discussed it. And it [–] I mean, it was [–] and that was formulated based upon what proof we had in front of us and how we knew [–] we actually made the [–] it's on the record if I'm not mistaken, that, you know, the self-defense was never going to be an issue towards the premeditated. It was voluntary. It wasn't that he didn't kill this victim it was why.

When asked if she had interviewed Doctor Mileusnic-Polchan prior to trial, trial counsel responded that "there was no need to speak" to the pathologist because she had been involved in prior cases with Doctor Mileusnic-Polchan and that trial counsel "was very confident with her findings." Trial counsel described the pathologist as "a very commanding witness" who the jurors "listen [to] when she speaks." Trial counsel opined that it would have been a "waste of resources" to hire an independent forensic pathology expert because "[t]here was no dispute that [the victim] was struck repeatedly," and because the petitioner was not going to pursue a self-defense theory, finding an expert to testify as to the position of the victim's body would not be helpful.

Trial counsel testified that she did not interview the State's blood spatter expert, Ms. Sutton, prior to trial because she had read Ms. Sutton's report "and it said exactly what we needed it to say." Trial counsel opined that the State had used Ms. Sutton to nullify what it believed would be a theory of self-defense, but because the petitioner did not pursue self-defense at trial, Ms. Sutton did "nothing to have hurt us." Trial counsel did not believe it was necessary to hire independent experts because the opinions of Doctor Mileusnic-Polchan and Ms. Sutton "were conclusive with what we were saying happened with the [–] with the voluntary based upon [the petitioner's] seeing the underwear [–] standing up, seeing the underwear, and acting in a fluid manner." Moreover, trial counsel wanted to avoid "dueling experts." With respect to a perceived discrepancy between Ms. Sutton's written report and her trial testimony as to whether the victim was lying down at the time of the attack, trial counsel denied that it was important to cross-examine Ms. Sutton on that issue "because she testified the way that we needed her to outside of what her report" indicated, and if trial counsel "had turned around and impeached her after getting" the beneficial testimony, it "would have negated" the benefit.

Trial counsel stated that all of the lay witnesses at trial had testified to the petitioner's high level of intoxication prior to the victim's murder, and, accordingly, she did not believe that an expert in neuropharmacology would have been beneficial:

> There was enough questioning through [–] and it's what we did through [v]oir [d]ire, you know, there was questions about intoxication, questions about different aspects, you know [–] there were [–] everybody was [–] we knew we were going to hit up the impairment factor and just how inebriated or high [–] and/or high that he was. It was to a point how a [–] a normal person's going to understand, there was [–] I can't remember which one it was, but it was like "oh yeah, he . . ." I remember he was like, "oh he was, he was wasted." So it [–] ] we had that. It wasn't a situation where we didn't have that evidence. We had that evidence that he was intoxicated, which went towards our voluntary that [–] how it happened. It wasn't necessary because we [–] you know, you don't want dueling experts. It was a [–] it was a [–] it was a tactical decision and we discussed it, to keep it to the point.

On cross-examination, trial counsel confirmed that, with the petitioner's consent, she had asked the trial court not to instruct the jury on self-defense.

Edward Miller, Public Defender for the Fourth Judicial District, testified as an expert "[o]n the prevailing professional norms of defense practice." When questioned about the damaging nature of the testimony of Doctor Mileusnic-Polchan, Mr. Miller responded that "if your defense is self-defense, the fact that he was laying [–] struck while laying on the couch is detrimental." Mr. Miller opined that he believed he would have hired an independent forensic expert in the instant case because "[y]ou want to, if at all possible, pursue that defense and if it can be supported in any way forensically you need to explore that." He disagreed with trial counsel's decision to accept the pathologist's findings at face value, testifying that Doctor Mileusnic-Polchan "has tremendous credibility problems here especially around the Knoxville Defense Bar." Mr. Miller stated that he believed trial counsel's decision to abandon a theory of self-defense "[w]ithout exploring, not only the State's facts but employing your own independent experts" was "unreasonable."

With respect to the testimony of Ms. Sutton, Mr. Miller stated that the difference between her written report, in which she could not exclude the victim's placement on the sofa when he was first struck with the axe, and her testimony, in which she stated that the victim was on the sofa at the time of the initial strike, would have been important to cross-examine on "if your theory was self-defense" but would have been "less important to bring it out I guess on the theory of defense that was offered." When asked if trial counsel had "unreasonably abandon[ed] the theory of self-defense," Mr. Miller responded, "Without further investigation, in my opinion she did." Mr. Miller opined that trial counsel should have hired an independent blood spatter expert and that her failure to do so was unreasonable "under the circumstances where the [petitioner's] statement had been given as self-defense." Mr. Miller agreed that without consulting an independent expert, trial counsel was not sufficiently prepared to cross-examine Ms. Sutton.

Mr. Miller testified that it was his practice to hire a neuropharmacologist when he had cases involving drugs and intoxication because such an expert "not only knows everything about the mind and everything about drugs but he knows how the drugs operate on the mind." In addition, Mr. Miller testified, a neuropharmacologist can "listen to the testimony, review[] the evidence, and probably give[] testimony as to the [–] generalized testimony as to how this [d]efendant's intoxication may have [a]ffected his ability to premeditate and have a calm mind and plan and that sort of thing." Mr. Miller believed that trial counsel's failure to hire a neuorpharmacologist was unreasonable and that it prejudiced the petitioner because the jury "did not have the science there to make the nexus" between intoxication and the petitioner's mental state.

On cross-examination, Mr. Miller conceded that he had not been present at the petitioner's trial and that he had not reviewed the entire trial transcript.

With this evidence, the post-conviction court denied relief, finding, in pertinent part, as follows:

> [T]he [c]ourt finds that [trial counsel's] tactical choice [to not hire a neuropharmacologist] was based on adequate preparation and past experience with [j]urors. [Trial counsel's] conduct was certainly in the range of reasonable professional assistance. Even if the [c]ourt were to have found that [trial counsel's] decisions to not retain a neuropharmacological expert was not reasonable the [c]ourt finds that the [p]etitioner has failed to prove that he was prejudiced by this choice with a sufficient probability that the result of the proceeding would have been different. Therefore the [p]etitioner's claim for relief on this basis is dismissed.
>
>   . . . [The c]ourt accredits the testimony of [trial counsel] that after an investigation of all the pertinent and [i]ncontrovertible evidence as well as her discussions with the [p]etitioner that the decision in consultation and with full agreement of the [p]etitioner that the defense of self-defense should be abandoned [w]as a matter of trial strategy. This record fully supports the very good reasons for this choice. The [p]etitioner has failed to prove that [trial counsel's] failure to retain either a Forensic Pathologist or Blood Spatter Expert was unreasonable or prejudicial. Therefore [p]etitioner's request[s] for relief based on these claims are dismissed.
>
>   Next, the [p]etitioner alleges that [trial counsel] failed to adequately cross examine [Ms. Sutton], the State's Blood Spatter Expert with regard to the inconsistencies between her written report and her trial testimony. The [c]ourt finds that [trial counsel] did an absolutely masterful and remarkable job of cross examining this expert witness and in [e]ffect turned this witness into what was most likely the [p]etitioner's best witness. Therefore, the [p]etitioner's claim for relief on this basis is dismissed.

In this appeal, the petitioner reiterates his claim of ineffective assistance of counsel, claiming that trial counsel performed deficiently by failing to hire or consult

- 11 -

with a forensic expert, a blood spatter expert, and a neuropharmacology expert and by failing to properly cross-examine the State's blood spatter expert. The State contends that the post-conviction court did not err by denying relief.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies

only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Kendrick*, 454 S.W.3d at 457; *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record fully supports the ruling of the post-conviction court. The petitioner failed to present an expert in forensics, blood spatter analysis, or neuropharmacology at the evidentiary hearing. As such, we cannot speculate what any of these expert witnesses might have testified to at trial. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). That the petitioner called Mr. Miller as an expert in local criminal defense practice does nothing to change the fact that the petitioner failed to present the testimony of the aforementioned expert witnesses at the post-conviction evidentiary hearing, as required by *Black*. Moreover, trial counsel's reasoning for not calling these witnesses – that they were not needed due to the abandonment of the self-defense theory and that there was no need for "dueling experts" – was a "reasonably based trial strategy" that we will not "second-guess." *See Adkins*, 911 S.W.2d at 347. With respect to the petitioner's argument that trial counsel failed to adequately cross-examine Ms. Sutton, the evidence does not preponderate against the post-conviction court's finding that trial counsel "did an absolutely masterful and remarkable job of cross examining" Ms. Sutton and that trial counsel effectively turned Ms. Sutton "into what was most likely the [p]etitioner's best witness." As such, we hold that the petitioner has failed to prove by clear and convincing evidence that trial counsel's representation was deficient or prejudicial.

The petitioner failed to establish that he was denied the effective assistance of counsel at trial. Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE